

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

———————————————

No. 08-24-00415-CR

———————————————

Jorge Luis Almeida, Appellant

v.

The State of Texas, Appellee

---

On Appeal from the 171st District Court
El Paso County, Texas
Trial Court No. 20180D06483

---

## MEMORANDUM OPINION

Appellant Jorge Luis Almeida was indicted and convicted of murdering Julius Santaromana by using his arms to asphyxiate him. He appeals his conviction and the trial court's entry of a deadly-weapon finding on the judgment. We affirm.

### I. BACKGROUND

Almeida's first trial ended in a hung jury and mistrial. The evidence presented at the second trial was as follows:

One night in August 2018, Santaromana's daughter, Destiny Santaromana, told him that Almeida was outside their home asking for him. Almeida and Santaromana knew each other because they were both involved in rooster fighting, but no evidence was presented about the extent of their relationship or any dispute between the two. After Santaromana went outside, his nephew, Alexis Luevanos, looked through the window and saw the two men fighting. When the fighting continued, Alexis and Julius, Santaromana's son, went outside. They described the scene in their testimony: Almeida was on top of Santaromana, holding him in a chokehold and covering his mouth. Santaromana was unresponsive. They tried but were unable to remove Almeida from Santaromana.

Hearing the commotion, Destiny and Santaromana's mother-in-law also came out of the house. Everyone tried to separate Almeida from Santaromana. Julius threatened Almeida with a BB gun that resembled a revolver. When that failed to deter Almeida, Alexis and Julius began punching and kicking Almeida.[1] Witnesses also recounted that Santaromana's mother-in-law slapped Almeida multiple times. Julius called other relatives who lived nearby and testified that when they arrived, his cousin got a hammer from the back of his car, but his aunt stopped him before he could hit Almeida with it.

Alexis called 911. A recording of that call portrays a chaotic scene with Santaromana's relatives crying and screaming at Almeida. When Almeida finally got off Santaromana, Santaromana remained unconscious, and his mother-in-law attempted CPR.

At trial, witnesses provided differing accounts of Santaromana and Almeida's injuries. Alexis told the police that Santaromana was bleeding from the back of his head and that Almeida also had some blood on his face and hands. Julius also described seeing a cut on Almeida's chest.

---

[1] Although Alexis told the police in his statement that he kicked Almeida, at trial he said he did not remember doing so.

Destiny testified that she did not see any blood on Almeida and did not remember if there was blood on her father. One paramedic saw abrasions on Almeida's hands but no injuries on anyone else. Another testified to lacerations, blood, and possible swelling on Almeida's face. Photographs of Almeida taken by the police after his arrest show scratches and what appears to be a large bruise or abrasion on his face, a scratch near his collar bone, and scrapes and bruises on his elbows and fingers. Julius and Destiny testified that they saw broken glass everywhere that came from a drinking glass that their dad had, but Alexis did not recall seeing broken glass.

By the time the paramedics arrived, Santaromana had no pulse and was taking only two breaths per minute. While being transported to the hospital, Santaromana's heart stopped several times. Although he was resuscitated each time, the lack of oxygen to his brain for an extended period left him with no brain activity. His family ultimately decided not to take any more life-saving measures.

The State and Almeida presented conflicting expert witness testimony on Santaromana's cause of death. It was undisputed that Santaromana had significant cardiac disease. His heart was enlarged, and he had severe arterial blockage and had suffered previous heart attacks. Defense expert witness, pathologist Fausto Rodriguez, reviewed the medical and autopsy records and testified that Santaromana died from a heart attack because the extent of the arterial blockage made it impossible for his heart to pump the increased blood supply that he would have needed in a strenuous fight. Rodriguez did not believe that Santaromana asphyxiated or was strangled because his hyoid bone (a small bone in the larynx) was intact.

The State's expert witness, county medical examiner Adam Gonzalez, explained that asphyxiation can be caused by many different mechanisms, not all of which involve pressure on the hyoid bone or result in a break of that bone. For example, a person can asphyxiate by drowning,

3

choking on food, or compression of blood vessels and his hyoid bone would not be affected. Gonzalez testified that Santaromana died from one of these methods—specifically, compression of the carotid arteries—because there was hemorrhaging of Santaromana's neck strap muscles, injuries to the inside of Santaromana's lips, and petechial hemorrhages which indicated smothering and an increase in pressure. Gonzalez acknowledged that Santaromana had "significant cardiac disease" but concluded that it was a "contributing factor" and not the primary cause of death.

During the charge conference, Almeida requested jury instructions on self-defense and the lesser-included offense of manslaughter, which the trial court denied. The jury returned a guilty verdict and sentenced Almeida to 58 years.

Almeida argues that the trial court erred by refusing to include jury charge instructions for self-defense (issue one) and the lesser-included offense of manslaughter (issue three). Almeida also challenges the trial court's entry of a deadly-weapon finding on the judgment (issue two).

## II. JURY CHARGE

Almeida argues that jury charge error requires reversal because the trial court denied his request to include instructions on self-defense and the lesser-included offense of manslaughter.

### A. Self-defense

#### (1) *Applicable law and standard of review*

"It is a defense to prosecution that the conduct in question is justified[.]" Tex. Penal Code § 9.02. One such justification is self-defense. *Id*. §§ 9.31, 9.32. As relevant to this case, "[a] person is justified in using deadly force against another . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary [] to protect the actor against the other's use or attempted use of unlawful deadly force[.]" *Id.* § 9.32(a)(2)(A). The reasonable belief element of self-defense contains both a subjective component and an objective component. *Lozano v. State*,

4

636 S.W.3d 25, 32 (Tex. Crim. App. 2021). The defendant (1) must subjectively believe that the other person is using deadly force and that it is immediately necessary for him to respond with deadly force and (2) that belief must be objectively reasonable. *Id.* "A reasonable belief is one held by an 'ordinary and prudent man in the same circumstances as the actor.'" *Id.* (quoting Tex. Penal Code § 1.07(a)(42)).

"A trial court errs in denying a self-defense instruction if there is some evidence, from any source, when viewed in the light most favorable to the defendant, that will support the elements of self defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017); Tex. Penal Code § 2.03(c) ("The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense."). Because the jury is the factfinder and must ultimately determine whether self-defense was established, the trial court must instruct the jury if there is some evidence to support the defense even if the evidence is "weak, inconsistent, or contradictory." *Rodriguez v. State*, 629 S.W.3d 229, 231 (Tex. Crim. App. 2021); *Booth v. State*, 679 S.W.2d 498, 502 (Tex. Crim. App. 1984) (en banc). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). In determining whether the evidence raised the defense, we "view the evidence in the light most favorable" to the defense. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

**(2) *Analysis***

When a defendant chooses not to testify, self-defense can still be raised by evidence from any source, even the State's witnesses. *Smith v. State*, 676 S.W.2d 584, 586 (Tex. Crim. App. 1984); *VanBrackle v. State*, 179 S.W.3d 708, 712 (Tex. App.—Austin 2005, no pet.) ("Defensive issues may be raised by the testimony of any witnesses, even those called by the State."). "Like a culpable

5

mental state, a person's belief, absent direct evidence, generally must be inferred from the circumstances of the case." *Lozano*, 636 S.W.3d at 33. Such evidence can consist of "the defendant's conduct or statements . . . during or shortly after the offense," *Olmos v. State*, 693 S.W.3d 474, 483 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd), or other "observable manifestations" of the defendant's belief. *VanBrackle*, 179 S.W.3d at 713.

For example, in *Smith v. State,* a witness testified that the defendant said to the complainant, "I don't want to fight you. Man go on and leave me alone." *Smith*, 676 S.W.2d at 586. Another witness said the complainant, not the defendant, was the first aggressor by pointing a gun at the defendant. *Id*. The Court of Criminal Appeals held that the testimony about defendant's statements and the circumstances surrounding the incident, were sufficient evidence to raise the issue of self-defense even if it was "not strong and convincing." *Id*. at 587; *see also VanBrackle*, 179 S.W.3d at 714 (evidence that appellant took gun away from complainant and called for help and that complainant began "fumbling in his pocket as if to pull out another object" were evidence of appellant's belief that shooting the complainant was immediately necessary.); *Durden v. State*, 659 S.W.3d 26, 37 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (holding that even though the defendant did not testify, a witness's testimony that the defendant told him that the victim was trying to rape her was evidence of the defendant's subjective belief that the use of force was immediately necessary.).

Almeida argues that there was more than a scintilla of evidence that raised the issue of self-defense. Specifically, he says, the evidence shows that the confrontation was "chaotic" and "fast-moving" and that Almeida suffered injuries. However, there was no evidence about what happened or was said between the two of them before Almeida held Santaromana down in a chokehold. The presence of bruising, scratches, and abrasions on Almeida is not evidence that he believed he

6

needed to use deadly force. For one, there was no evidence that those injuries were even caused by Santaromana. The evidence, in fact, suggests that Almeida was injured when Santaromana's family hit and kicked him, trying to defend Santaromana. Critically, there was no evidence that Almeida believed and that a reasonable person would believe deadly force was immediately necessary.

The fact that a set of circumstances could be imagined that would justify Almeida's actions is not sufficient; there must be some evidence to support the conclusion that he believed deadly force was immediately necessary. In *Lozano v. State*, the Court of Criminal Appeals rejected an argument that a self-defense instruction was required when, like here, the defendant *could* have believed he needed to use deadly force but there was no evidence to support that belief. As the Court explained:

> Although the evidence shows that Appellant brandished a firearm in response to Jorge throwing an almost-full beer can through the passenger-side window, which "exploded," there is no evidence as to why Appellant brandished the firearm. It might have been because he believed that he needed to defend himself with deadly force, but he also might have overreacted in the moment or even brandished the firearm to intentionally escalate the situation. The same is true when Jorge ran around the truck and punched Appellant through the open driver's-side window. It might be that Appellant believed that he was justified in using deadly force against Jorge, but no evidence supports that conclusion. Also, the fact that Appellant shot Jorge three times could be relevant to whether the use of deadly force was justified depending on the context. For example, Appellant might have shot Jorge three times because he thought that he was fighting for his life, and it was either him or Jorge. Or, he might have shot Jorge once in self-defense, then continued shooting even though he knew Jorge was no longer a threat. However, we simply do not know on this record why Appellant shot Jorge three times. Appellant argues that the evidence shows that he was the victim of a "coordinated attack by a group of experienced predators," which was sufficient for a jury to infer that Appellant was in "reasonable fear of serious bodily injury based on disparity of numbers." But the evidence does not support that there were multiple aggressors.

*Lozano*, 636 S.W.3d at 34

Similarly, in this case, Santaromana *might* have been the first aggressor. He *might* have broken the glass and tried to use it as a weapon, as Almeida's attorney argued at the charge conference. But, like in *Lozano*, suggesting a plausible scenario is not enough; there must be evidence supporting that version of events. Here, no witnesses testified about anything that happened between Santaromana and Almeida from the time Santaromana walked out of the house until his family found Almeida on top of an unconscious Santaromana. There was no evidence of any statements, actions, or other observable manifestations from which it could be inferred that Almeida believed his life was in danger unless he used deadly force.[2]

In the absence of such evidence, the only way for Almeida to have raised self-defense would have been through his own testimony. He claims that forcing him to testify to raise the defense would violate his Fifth Amendment rights. "[T]he fact that his defense could not be established without his testimony, however, does not mean that his testimony was compelled." *Madrigal v. State*, 347 S.W.3d 809, 815 (Tex. App.—Corpus Christi 2011, pet. ref'd). In fact, as recognized by the Court of Criminal Appeals, because self-defense requires evidence of a defendant's subjective belief, defendants are rarely able to present sufficient evidence without testifying. *Smith*, 676 S.W.2d at 585; *see also Olmos*, 693 S.W.3d at 483.

Finally, Almeida argues that the mistrial after the first trial does not eliminate his right to a jury instruction. There is no indication, however, that the trial court refused the instruction because it was included in the first trial's jury charge. Instead, as we have stated above, the self-defense instruction was properly refused because no evidence *in this trial* raised it.

---

[2] Moreover, self-defense is a confession and avoidance defense. *Rodriguez v. State*, 629 S.W.3d 229, 231 (Tex. Crim. App. 2021). While a defendant does not have to take the stand or admit to every element of the offense, an outright denial of engaging in the conduct of which he is accused deprives him of his right to a self-defense instruction, even if the State's evidence raises the issue. *Id.*; *Johnson v. State*, 715 S.W.2d 402, 406 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd). Because we hold that there was no evidence raising self-defense, we do not reach whether Almeida's presentation of expert testimony that Santaromana died of a heart attack constituted a denial of Almeida's conduct such that he was not entitled to a self-defense instruction.

No evidence was presented from any source that circumstantially or directly showed that Almeida subjectively believed that he needed to use deadly force in self-defense or that such belief was objectively reasonable. The trial court properly denied Almeida's request for a self-defense jury instruction. His first issue is overruled.

## B. Lesser-included offense

In his third issue, Almeida argues that the trial court erred by refusing to submit to the jury an instruction for the lesser-included instruction of manslaughter.

### (1) *Applicable law and standard of review*

Pertinent to this case, a person commits murder if he "*intends* to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual[.]" Tex. Penal Code § 19.02(b)(2) (emphasis added). "A person acts intentionally, or with intent . . . when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). If a person causes the death of another recklessly, instead of intentionally, he commits only manslaughter. *Id.* § 19.04(a). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id*. § 6.03. The parties do not dispute that the only difference between the two offenses is that manslaughter requires a "less culpable mental state" and that, therefore, manslaughter is a lesser-included offense of murder. *Cavazos v. State*, 382 S.W.3d 377 384 (Tex. 2012); Tex. Code Crim. Proc. art. 37.09(3).[3]

---

[3] An offense is a lesser-included offense than that charged if:

    (1)   it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

    (2)   it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

However, like with self-defense, a defendant is entitled to a jury instruction on a lesser-included offense only "if some evidence from any source raises a fact issue on whether he is guilty of only the lesser[-included offense], regardless of whether the evidence is weak, impeached, or contradicted." *Cavazos*, 382 S.W.3d at 383. The threshold requirement of some evidence to raise an issue of fact "requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Id*. In addition, "To preserve error with respect to a requested LIO [lesser-included offense] instruction, 'the defendant must point to evidence in the record that raises' it" unless the specific evidence raising the issue is "manifest." *Green v. State*, 713 S.W.3d 865, 874–75 (Tex. Crim. App. 2025), *cert. denied*, 224 L. Ed. 2d 19 (Feb. 23, 2026) (quoting *Williams v. State*, 662 S.W.3d 452, 461 (Tex. Crim. App. 2021)).

**(2)** *Analysis*

For the trial court to have instructed the jury on manslaughter, there must have been some evidence from which a rational jury could find both that (1) Almeida did not intend to cause serious bodily injury *and* (2) Almeida was "aware of but consciously disregarded a substantial and unjustifiable risk that death would occur as a result of his conduct." *Cavazos*, 382 S.W.3d at 385.

In his brief, Almeida argues that "the record includes at least some evidence from which a jury could conclude the defendant acted recklessly rather than intentionally or knowingly." But he does not point to specific evidence that he claims would support a finding of recklessness. Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made,

---

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

Tex. Code Crim. Proc. art. 37.09.

with appropriate citations to authorities and to the record."). During trial, Almeida argued that the evidence showed that he was "reckless in the use of force" by "grabbing the individual [from] behind, by covering his mouth, by placing [his] hand on his chest"—things that a "normal person wouldn't do." The fact that Almeida used excessive force is not, however, evidence from which a jury could find that he did not intend to cause serious bodily injury or that he was aware of but disregarded the risk that Santaromana could die. Indeed, if such evidence were sufficient, then every defendant tried for murder would be entitled to a manslaughter instruction without evidence of his state of mind simply because he used more force than a "normal person" would.

Instead of showing that Almeida acted recklessly, the evidence was that Almeida continued to hold Santaromana down and in a chokehold, even after Santaromana had lost consciousness and despite multiple attempts by multiple witnesses to remove him from Santaromana. This is not affirmative evidence that Almeida acted recklessly, nor does it support an inference that Almeida did not intend to kill or seriously injure Santatomana. *Cf. Cavazos*, 382 S.W.3d at 385 ("Pulling out a gun, pointing it at someone, pulling the trigger twice, fleeing the scene (and the country), and later telling a friend 'I didn't mean to shoot anyone' does not rationally support an inference that Appellant acted recklessly at the moment he fired the shots.").

We overrule Almeida's third issue.

## III. DEADLY-WEAPON FINDING

In his second issue, Almeida argues that the trial court had no authority to enter a deadly-weapon finding on the judgment because the jury charge and verdict form did not include a deadly-weapon special issue.

**(1)** *Applicable law and standard of review*

When a jury makes an affirmative deadly-weapon finding, "the trial court *shall* enter the finding in the judgment of the court." Tex. Code Crim. Proc. art. 42A.054(c) (emphasis added). A jury can make an affirmative deadly-weapon finding even when the charge does not include a special issue or deadly weapon question. The Court of Criminal Appeals has described the following circumstances that constitute an affirmative deadly-weapon finding by the jury:

(1) the indictment specifically alleged a "deadly weapon" was used (using the words "deadly weapon") and the defendant was found guilty "as charged in the indictment;"

(2) the indictment did not use the words "deadly weapon" but alleged use of a deadly weapon *per se* (such as a firearm);[]

(3) the jury made an express finding of fact of use of a deadly weapon in response to submission of a special issue during the punishment stage of trial[; or]

.  .  .

[(4)]the indictment specifically alleges the use of "deadly weapon;" [] the jury charge's application paragraph on a lesser-included offense requires a finding from the jury beyond a reasonable doubt that the defendant committed an offense using the alleged "deadly weapon;" [] and the jury finds the defendant guilty of that lesser-included offense.

*Duran v. State*, 492 S.W.3d 741, 746–47 (Tex. Crim. App. 2016); *see Lafleur v. State*, 106 S.W.3d 91, 98–99 (Tex. Crim. App. 2003); *Polk v. State*, 693 S.W.2d 391, 396 (Tex. Crim. App. 1985) (en banc).

Consequently, when determining whether the jury made a deadly-weapon finding, we consider not only whether there is an affirmative answer to a deadly-weapon special issue, but also "the charging instrument, the jury charge, and the jury verdict to evaluate the propriety of an entry of a deadly-weapon finding in the judgment." *Duran*, 492 S.W.3d at 746. Courts review de novo whether the jury made an affirmative finding, permitting the trial court to enter the finding on the judgment. *See, e.g.*, *Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009) (determining

whether finding was made based on the indictment and verdict, without affording discretion to the trial court's determination).

### (2) *Analysis*

The application paragraph of the jury charge instructed the jury to find Almeida guilty if it found beyond a reasonable doubt that Almeida:

> [w]ith intent to cause serious bodily injury to an individual, namely Julius Santaromana, commit an act clearly dangerous to human life that caused the death of the said Julius Santaromana, to wit: causing asphyxia to Julius Santaromana with Defendant's arm, and did then and there use or exhibit a deadly weapon, to wit: an arm, during the commission of the offense or during immediate flight from said offense.

To find Almeida guilty, the jury necessarily had to find these allegations true, including that he used his arm as a deadly weapon. The jury's guilty verdict in response to the above application paragraph is an affirmative deadly-weapon finding. Even if the jury charge had not used the phrase "deadly weapon," a finding that Almeida used his arm to cause Santaromana's death is a finding that his arm is capable of causing death and is therefore a deadly weapon. Tex. Penal Code § 1.07(17)(B) (defining deadly weapon as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury"). *Crumpton*, 301 S.W.3d at 665 ("If a deadly weapon is anything that is capable of causing death or serious bodily injury, and the indictment alleges that the defendant caused death or serious bodily injury, and the jury finds the defendant guilty as charged in the indictment, the verdict is necessarily a finding that a deadly weapon was used."). The trial court had not only the authority, but also the duty, to enter the deadly-weapon finding on the judgment. Tex. Code Crim. Proc. art. 42A.054(c). We overrule Almeida's second issue.

## IV. CONCLUSION

The evidence at trial did not raise the issue of self-defense or the lesser-included offense of manslaughter. Further, by finding Almeida guilty in response to the jury charge's application paragraph, the jury made an affirmative deadly-weapon finding. The judgment of the trial court is affirmed.

MARIA SALAS MENDOZA, Chief Justice

July 13, 2026

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)